IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JANET BETH NUNN,                                    Case No. 6:17-cv-00203-SB

    Plaintiff,                              **OPINION AND ORDER**

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

    Defendant.

_____

**BECKERMAN, Magistrate Judge.**

    Janet Beth Nunn ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 401-34, 1381-83f.[1] The Court has jurisdiction to hear Plaintiff's appeal pursuant to

---

[1] This case was previously remanded to the Social Security Administration ("SSA") for
further administrative proceedings. On remand, the SSA's Appeals Council instructed the
Administrative Law Judge ("ALJ") to address Plaintiff's application for DIB (the subject of her
previous appeal) and her "subsequently filed" application for SSI "in a hearing decision." (Tr.
12.)

42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court reverses the Commissioner's decision and remands to the agency for the calculation and award of benefits.

## BACKGROUND

Plaintiff was born in late July 1972, making her twenty-nine years old on July 1, 2002, the alleged disability onset date. (Tr. 15, 28.) She has "at least a high school education" and "no past relevant work." (Tr. 28.) In her applications for benefits, Plaintiff alleges disability due to fibromyalgia, depression, anxiety, posttraumatic stress disorder ("PTSD"), and high cholesterol. (Tr. 46, 60, 418.)

On May 10, 2002, approximately two months before the alleged onset date, Plaintiff visited the emergency room complaining of a headache and neck pain. Plaintiff reported that "[s]he was the restrained driver of a vehicle at a stop when a truck went in reverse and backed into her." (Tr. 557.) Plaintiff was diagnosed with a cervical stain and given a prescription for hydrocodone.

On April 28, 2003, Dr. Leonard Marcel ("Dr. Marcel"), a psychiatrist, noted that Plaintiff had been diagnosed with depression, that Plaintiff "continued to do well" on her dosage of Zoloft, that Plaintiff is the primary caregiver for two children because her husband was working a lot, that Plaintiff shows no objective signs of depression, and that Plaintiff's ten-year-old son "remains in residential [treatment] at Parry Center for psychosis-NOS, ADHD, and ODD." (Tr. 555.)

On October 19, 2004, Plaintiff visited Dr. Peter de Schweinitz ("Dr. de Schweinitz"), complaining of numbness and worsening bilateral wrist and hand pain. Dr. de Schweinitz diagnosed Plaintiff with bilateral carpal tunnel syndrome and advised Plaintiff that "she may end up needing to go to the orthopedic surgeon for a procedure if she does not rest her wrists." (Tr. 566.)

In a progress note dated July 17, 2006, Dr. Erling Oksenholt ("Dr. Oksenholt") stated that Plaintiff has a history of suffering from pain in her feet and "here and there over her body." (Tr. 590.) Dr. Oksenholt assessed that Plaintiff was suffering from "[p]ossible fibromyalgia" and obesity. (Tr. 591.)

In a progress note dated May 14, 2007, Dr. Oksenholt stated that Plaintiff suffers from "generalized aching all over," and she "feels pain to palpation suggestive of fibromyalgia." (Tr. 577.)

On May 22, 2007, Plaintiff appeared for a counseling session with Sheila Crandles ("Crandles"), a licensed clinical social worker. Crandles noted that Plaintiff was "feeling better" after being prescribed medication for pain, "lim[p]ing less," and no longer using a cane. (Tr. 602.) Around that time, Crandles also noted that Plaintiff complained of pain that significantly impaired her ability to sleep and function, and expressed "frustration not having a clear medical diagnosis." (Tr. 603.)

On September 4, 2007, Dr. Paul Rethinger ("Dr. Rethinger"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 643-56.) Dr. Rethinger concluded that Plaintiff's impairments failed to meet or equal listing 12.04 (affective disorders).

In a Physical Summary dated September 6, 2007, Dr. J. Scott Pritchard ("Dr. Pritchard"), a non-examining state agency physician, noted that he reviewed Plaintiff's medical records and found no evidence that Plaintiff was suffering from a severe medically determinable impairment

between the alleged onset date (July 1, 2002) and the date last insured (December 31, 2006).[2] (Tr. 657.)

On December 16, 2007, Plaintiff visited the emergency room complaining of chronic pain. Plaintiff reported "a history of fibromyalgia" and stated that she did "not know what to do about the discomfort," her pain interfered with her ability to sleep, and she was under "a lot of stress lately, which often exacerbates her pain." (Tr. 672.) Dr. Michael Halferty ("Dr. Halferty") noted that stress "frequently worsens" Plaintiff's "symptoms of fibromyalgia," that Plaintiff's diagnoses include fibromyalgia, and that Plaintiff "was given instructions about fibromyalgia[.]" (Tr. 673; *see also* Tr. 693, noting on December 17, 2007, that Plaintiff suffers from "[l]ikely fibromyalgia" and a referral to "rheumatology or physiatry" would be considered "when she gets insurance again").

In a Physical Summary dated March 7, 2008, Dr. Mary Ann Westfall ("Dr. Westfall"), a non-examining state agency physician, found that there was insufficient evidence in the record to evaluate Plaintiff's disability claim between the alleged onset date and date last insured. (Tr. 660.)

---

[2] To be eligible for DIB under Title II, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07–01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based upon a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status] . . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2006, reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before December 31, 2006, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

In a Mental Summary dated March 10, 2008, Dr. Bill Hennings ("Dr. Hennings"), a non-examining state agency psychologist, found that there was insufficient evidence in the record to evaluate Plaintiff's disability claim between the alleged onset date and date last insured. (Tr. 661.)

On July 9, 2008, Plaintiff was referred to Dr. Laura Rung ("Dr. Rung"), a doctor of physical medicine at The Corvallis Clinic, regarding Plaintiff's chief complaints of "[c]hronic pain all over, [but in her] right hip mostly." (Tr. 774.) Plaintiff reported that it had "been over 10 years since she was without pain," "[s]he does some limited housework" and "most of the cooking," and she had "only purchased groceries herself one time in the last 6 months" and "her pain exacerbated for the following 3 days." (Tr. 774.) Dr. Rung's musculoskeletal examination revealed that Plaintiff tested positive for thirteen of eighteen fibromyalgia tender points, which caused Dr. Rung to opine that Plaintiff had been suffering from "[p]robable fibromyalgia." (Tr. 775.)

On July 23, 2008, Plaintiff visited Edward Taylor ("Taylor"), a physician's assistant, complaining of "a bad last few weeks" due to stress, sleeping poorly, and feeling "'exhausted and miserable.'" (Tr. 685.) Taylor noted that he reviewed Dr. Rung's report, which indicated that Plaintiff suffers from "[p]robable fibromyalgia" and could benefit from, among other things, taking Doxepin, participating in "aerobic exercise" in a "warm pool," and losing weight. (Tr. 686.)

On September 23, 2008, Plaintiff visited Scott Johnson ("Johnson"), a physician's assistant, complaining of back pain. Plaintiff denied "any incident of injury" and reported "a long history of fibromyalgia which [s]he believe[d] [her] pain [was] related to." (Tr. 665.) Johnson prescribed tramadol because Plaintiff reported that she was allergic "to hydrocodone and

oxycodone," and that in the past, tramadol helped "control her pain secondary to fibromyalgia." (Tr. 666.)

On October 13, 2010, Plaintiff "protectively filed an application" for SSI benefits.[3] (Tr. 12, 58.)

On December 31, 2010, Plaintiff was referred to Dr. Brian Daskivich ("Dr. Daskivich"), a psychologist, for a consultative evaluation. (Tr. 819-24.) Based on his clinical interview, mental status examination, and review of limited records, Dr. Daskivich's primary diagnoses were somatoform disorder, anxiety disorder, depressive disorder "by history," and nicotine dependence, and he assigned a Global Assessment of Functioning ("GAF") score of forty-five.[4] (Tr. 824.)

In his report, Dr. Daskivich also stated that (1) Plaintiff "described continuing to experience subjective pain but added, 'it is now manageable—tolerable—but annoying—not completely consuming,'" (2) Plaintiff reported that her "favorite activities include reading, playing games, camping, and trail hiking, with some recent improvement in her enjoyment of these given that she described being in . . . less subjective pain since discontinuing [Simvastatin] in November 2010," which she felt "contributed to 'overwhelming pain—all-consuming' that stopped about a week after she stopped taking Simvastatin," (3) "[t]here was nothing in [Plaintiff's] behavior today to suggest prominent anxiety or depression," and (4) "[t]here was

---

[3] "[T]he earliest an SSI claimant can obtain benefits is the month after which he filed his application[.]" *Schiller v. Colvin*, No. 12–771–AA, 2013 WL 3874044, at *1 n.1 (D. Or. July 23, 2013) (citation omitted).

[4] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (citation omitted). A GAF score of forty-one to fifty "indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Richards v. Colvin*, 640 F. App'x 786, 791 (10th Cir. 2016) (citation, quotation marks, brackets, and ellipses omitted).

nothing in [Plaintiff's] report to suggest a current or historical manic episode." (Tr. 820-24.) Dr. Daskivich added that in terms of "reliability, a tendency towards symptom exaggeration is suspected in the context of somatization with poor insight," the "severity and chronicity of [Plaintiff's] limitations as reported by [her] and by her spouse appear to be well in excess of what would be expected given the information reviewed in medical records that accompanied the referral," "[t]here was nothing in [Plaintiff's] presentation today to suggest she is suffering from a major depressive episode," nicotine dependence is "a part of the diagnostic picture," Plaintiff is "preoccupied with an array of somatic complaints," Plaintiff is the "primary caregiver for [a] son with [a] disability," and Plaintiff's "primary limitation is that [she] seems to have fully embraced the sick role and has a steadfast belief that she is unable to reliably work due to her array of somatic complaints," which also limits her ability to engage in effective personal and social functioning. (Tr. 820-24.)

On January 14, 2011, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 51.) Based on his review of the medical record, Dr. Kennemer determined that Plaintiff's mental impairments did not meet or equal listings 12.06 (anxiety-related disorders) or 12.07 (somatoform disorders).

Also on January 14, 2011, Dr. Kennemer completed a mental residual functional capacity assessment form, in which he rated Plaintiff's limitations in each of sixteen categories of mental ability. (Tr. 53-55.) Dr. Kennemer rated Plaintiff to be "[n]ot significantly limited" in twelve categories and "[m]oderately limited" in four categories. (Tr. 54-55.) Dr. Kennemer added that Plaintiff is capable of understanding, remembering, and carrying out short, simple, routine tasks and instructions, and working in the vicinity of others without exhibiting behavioral extremes.

He also stated that somatization precludes working with the public or in one-on-one settings with co-workers.

On January 25, 2011, Dr. Neal Berner ("Dr. Berner"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 52-53.) Based on his review of the record, Dr. Berner concluded that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk about six hours in an eight-hour workday; and push and pull in accordance with her lifting and carrying restrictions. He also found no evidence of any postural, manipulative, visual, communicative, or environmental limitations.

On August 10, 2011, Dr. Hennings completed a psychiatric review technique assessment, agreeing with Dr. Kennemer's finding that Plaintiff's mental impairments failed to satisfy listings 12.06 and 12.07. (Tr. 66-67.) That same day, Dr. Hennings completed a mental residual functional capacity assessment, agreeing with Dr. Kennemer's findings in all relevant respects. (Tr. 69-70.)

Also on August 10, 2011, Dr. Martin Kehrli ("Dr. Kehrli"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 68-69.) Based on his review of the medical record, Dr. Kehrli agreed with Dr. Berner's findings in all relevant respects.

On September 27, 2011, Dr. Tinko Zlatev ("Dr. Zlatev"), a radiologist, noted that a computed tomography ("CT") scan of Plaintiff's pelvis and abdomen revealed, *inter alia*, "severe degenerative central spinal stenosis in the lumbar spine, worse at the level of L4-LR." (Tr. 1078; *see also* Tr. 1028, "Spinal stenosis—severe noted on CT of Abd[omen] and Pelvis recently").

On July 23, 2012, Plaintiff visited Dr. Robert Kaye ("Dr. Kaye") complaining of back pain. Plaintiff reported that she vomited due to the severity of her pain. Dr. Kaye observed that "[t]here is no one trigger point that could be injected that would help" Plaintiff's chronic pain. (Tr. 979.)

On August 31, 2012, a magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed "[m]ild degenerative disease at L5-S1 with mild disc bulging," "small contour abnormalities, probably representing small herniations," and "[m]ild degenerative changes at other levels." (Tr. 974.)

On September 21, 2012, Plaintiff presented for a follow-up visit with Dr. Kaye regarding her back pain. Plaintiff reported that prednisone had helped with pain in her upper back and shoulders, but she was still "having a difficult time [with] function[ing] and be[ing] mobile." (Tr. 954.)

On October 29, 2012, images of Plaintiff's cervical spine revealed "[m]ild degenerative discogenic changes at C5-C6 and C6-C7" and "a bridging anterior osteophyte at C5-C6." (Tr. 937.)

On March 18, 2013, Dr. Kaye noted that Plaintiff continued to suffer from back pain and was "using a cane for support" because she was having difficulty walking and raising her right leg. (Tr. 881.)

In a letter dated April 10, 2013, Dr. Kaye noted that Plaintiff "was first seen in [his] clinic in March 2006," and he began treating Plaintiff in 2010 and has "seen her since then." (Tr. 1074.) Dr. Kaye also stated that he is familiar with Plaintiff's "records . . . dating back to when she was first seen" in his clinic; Plaintiff had been diagnosed with chronic back pain and muscle spasm due to a lumbar strain at L5-S1, morbid obesity, anxiety, major depressive disorder,

asthma, fatigue, "[f]ibromyalgia (diagnosed by Dr. Laura Rung, M.D. Corvallis Clinic on 7/9/08)," and insomnia; Plaintiff's pain and fatigue "makes it difficult for her to function at home or in the workplace on a reliable basis"; Plaintiff "cannot work in a setting in which she would be exposed to any respiratory irritants"; and in his "medical opinion," Plaintiff would miss at least two days of work per month "or the equivalent [amount of time] either in additional breaks or reduced pace." (Tr. 1074.) Dr. Kaye added that his "chart notes are not intended to explain [Plaintiff's] functional limitations," but his letter "has been developed for the express purpose of delineating functional limitations" and it is based on his "notes in combination with [his] overall diagnostic impression of [Plaintiff,] as well as [his] objective clinic observations and, to the extent that they provide additional information, [Plaintiff's] subjective reports of symptoms." (Tr. 1075.)

On April 26, 2013, Plaintiff underwent a cardiac catheterization procedure, which revealed "[n]o significant coronary artery disease," "[m]ild-to-moderate pulmonary hypertension," and "[m]ild right-sided heart failure secondary to diastolic dysfunction." (Tr. 1097.)

In a treatment noted dated February 10, 2014, Dr. Kaye noted that Plaintiff's physical examination revealed that she tested positive for fourteen of eighteen fibromyalgia tender points. (Tr. 1125.)

In a treatment note dated January 14, 2015, Dr. Stephen Dechter ("Dr. Dechter"), a doctor of osteopathic medicine at Corvallis Pain Management Clinic, noted that Plaintiff "was seen at the request of Dr. Kaye for a new patient consultation," Plaintiff stated that she has "had pain for many years," Plaintiff complained of "incapacitating pain" in her "low back, neck shoulder, hip, and leg," Plaintiff tested positive for eighteen of eighteen fibromyalgia tender

points, and Plaintiff's exam was "consistent with fibromyalgia as [her] primary pain generator."
(Tr. 1189-91; *see also* Tr. 1186, noting in February 2015 that Plaintiff exhibited "greater than 12 trigger points to palpation," Tr. 1173, noting in May 2015 that Plaintiff exhibited "[g]reater than 12 trigger points tender to palpation with the worst pain in the cervical and thoracic paraspinous region," Tr. 1291, noting in August 2015 that Plaintiff exhibited "[g]reater than 12 trigger points tender to palpation").

On November 19, 2015, Plaintiff was referred to Dr. Harry Krulewith ("Dr. Krulewitch"), a geriatric specialist and professor at Oregon Health and Sciences University, for a consultative examination. (Tr. 1199-1217.) Dr. Krulewitch noted that he was "provided records beginning in late 2001," that he reviewed "chart details included in two large folders including physician notes from clinic and hospital visits [from] 2002-2015," and that he reviewed records from "the early period 2002-2006" (i.e., the period between Plaintiff's alleged onset date and date last insured) "in more detail" because they are "[o]f particular interest to this case[.]" (Tr. 1201.) Dr. Krulewitch also noted that "there are chart notes for scheduled medical treatment for 2005-2015 that total over ten visits a year that are scheduled and additional numerous visits per year for injuries, exacerbations and relapses of chronic conditions"; Plaintiff "has documentation of over 100 examinations and visits to medical providers in a ten year period"; Plaintiff "almost never missed a scheduled visit" during that time period; and Plaintiff "has seen numerous [treating] physicians from many disciplines and there is not a single mention in any of her work ups of malingering, drug seeking, hypochrondriasis, somatoform disorder, or formation reaction." (Tr. 1201-02.)

Additionally, Dr. Krulewitch observed that Plaintiff's fibromyalgia diagnosis was "confirmed in 2008 but her symptoms were escalating between 1990 and 2000"; that Dr.

Krulewitch believes that the severity of Plaintiff's "symptoms meets the criteria for fibromyalgia"; that "all five[] screening questions" relating to fibromyalgia were "positive"; that Plaintiff "denies any illicit drug use, abuse of pain medications, or alcoholism all of which is confirmed by over a decade of close physician monitoring that confirms this"; that "[i]t is clear . . . that beginning in 2002 numerous examiners create a picture of a woman who made every effort to obtain a diagnosis and treatment for her condition of chronic pain and fatigue and functional decline"; that "[t]here is insufficient medical examination documentation . . . as evidence to confirm a clear [fibromyalgia] diagnosis before 2004"; and that "[t]he first mention o[f] fibromyalgia occurs [o]n 7/26/2006." (Tr. 1203-11.) Dr. Krulewitch also expressed "concern that over a fifteen year period beginning in 2000 [Plaintiff] began to experience a melancholic depression associated with bipolar type II disorder," a diagnosis that "was never entertained by her mental health team despite [her] failure to respond to their interventions over a five year period [between] 2005-2010," and that "[t]his disease process masked [Plaintiff's] primary disease of fibromyalgia with its psychomotor symptoms of fatigue, pain, morning weakness, anhedonia, functional decline, and a profound delay in activation and energy." (Tr. 1211.) Furthermore, Dr. Krulewitch questioned mental health providers who stated that Plaintiff was "'catastrophizing'" or "'embodying the sick role,'" noting that "twelve years of failure to respond to moderate to high [levels of medication] for major depression [is] not due to treatment failure but to diagnosis failure," "missed diagnoses and labels . . . from mental health staff . . . interfered with [Plaintiff] getting the help she needed in a timely manner," Plaintiff's "coping skills actually seem robust," Plaintiff was "offered only high doses of anti-depressants for which they did not even have a diagnosis," and Plaintiff was "'trained and monitored' to

embody the sick role" given her functional decline and "the inability of the medical community to diagnose and treat her effectively." (Tr. 1211-13.)

Finally, Dr. Krulewitch stated the following with respect to Plaintiff's onset date and ability to perform work-related activities: (1) "I strongly feel that the pattern of extensive monitoring for weakness and depression that began in 2005 was a reflection of [Plaintiff's] already progressing and relapsing disorder of fibromyalgia," (2) "[i]t is likely that [fibromyalgia] was present by 2002 but I have insufficient evidence to confirm this other than [Plaintiff's] own testimony," (3) Plaintiff's "symptoms of a bipolar depression were masking the onset of fibromyalgia by the time she began mental health counseling in January 2005," (4) "[i]n all likelihood by 2005 there was a body of evidence that [Plaintiff's] condition was unrelenting and unresponsive to multiple interventions which would become the pattern for her for the next decade," (5) "[g]iven that this situation of extensive monitoring and functional decline began around January 2005 I feel strongly that [Plaintiff's] physical condition prevented her from working in any job beyond 1-2 hours a day as early as 2002," (6) "I cannot determine if [Plaintiff's] condition was so severe that she could not pursue any full time work prior to 2002 but that is certainly a strong possibility," (7) Plaintiff "would be unable to maintain any regular work after 2002 but [medical] evidence is scant until 2004," (8) although Plaintiff "certainly did not ever resume working beyond 1-2 hours a day of housework and never five days in a row, always requiring breaks of 1-4 hours a day, the medical record does not allow me to confirm this," (9) Plaintiff "has moderately impaired concentration due to her combination of diseases both in 2004 and 2015," (10) "[b]y 2004 [Plaintiff] was unable to sustain any activity beyond 1-2 hours a day and would not benefit from breaks or supervision," (11) Plaintiff "has been unable to perform any normal work activity or sustain a normal work pace since 2002," (12) Plaintiff is

"markedly impaired" in her ability "to respond to changes, to recognize hazards and risks in the work setting, to travel any significant distance whatsoever, or to set realistic goals or plans," and (13) Plaintiff "was likely unable to work after 2002 in any capacity requiring more than two hours a day of any simple non strenuous activity," but "the medical documentation by exam is insufficient to support this until reliable chart notes appear from January 2005 documenting chronic fatigue and depression, [as well as] pain and weakness [on July 26, 2006]." (Tr. 1214-17.)

On June 14, 2016, Dr. Patrick Rask ("Dr. Rask"), the medical director at Plaintiff's pain management clinic, completed a medical questionnaire. (Tr. 1307-08.) In the questionnaire, Dr. Rask stated that he supervises and oversees the treatment provided by Jason Brown ("Brown"), the physician's assistant who treats Plaintiff at Corvallis Pain Management Clinic; Plaintiff's "diagnoses are primarily fibromyalgia, gout, long-term use of opiates, spasmodic torticollis, [and] brachial neuritis or radiculitis"; and Plaintiff "has proven to be a compl[ia]nt patient that shows consistently good effort in attempting to overcome and/or deal with her chronic pain issues." (Tr. 1307-08.) Dr. Rask also agreed with Dr. Krulewitch's opinions that the "objective medical evidence and clinical findings" support the conclusion that Plaintiff was "unable to sustain full-time employment" as of 2004; that the comments regarding Plaintiff "catastrophizing her illness were based on an error of diagnosis and treatment"; that Plaintiff's "melancholic depression masked her primary diagnosis of fibromyalgia around 2003 and later"; and that Plaintiff was "reliable in showing up" for appointments and following [treatment] recommendations. (Tr. 1307-08.)

On August 30, 2016, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 1346-71.) Plaintiff testified that she lives with her husband and two teenage children; her

husband works on a full-time basis by performing "odd jobs and repairs"; her pain and depression have "gotten progressively worse" since 2002; her pain waxes and wanes and interferes with her ability to concentrate, sleep, and function; she still smokes up to a pack of cigarettes per day; she drives; she has difficulty using her hands; her "mental issues fluctuate around the pain a lot"; she has gone out to eat, to the movies, and fishing when she "feel[s] well"; and her teenage children are homeschooled, but "they're fairly independent in their schooling" because they have "a determined program" that they work on. (Tr. 1351-56.) Plaintiff also testified that she "can actually do something" about "two or three days a month." (Tr. 1357-58.)

The ALJ posed a series of hypothetical questions to a Vocational Expert ("VE") who testified at Plaintiff's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform light work that involves frequent fine fingering, avoiding heights and hazards, no "exposure to noxious fumes, odors, [and] pulmonary irritants," and performing "only simple entry-level work involving not more than occasional interaction with the public and coworkers." (Tr. 1358.) The VE testified that the hypothetical worker could be employed as a bench assembler and in "light [h]ousekeeping jobs." (Tr. 1359.) Second, the ALJ asked the VE to assume that the hypothetical worker previously described was limited to occasional, as opposed to frequent, fingering. The VE testified that the hypothetical worker could perform light janitorial work and laundry sorter jobs, but she could not work as a bench assembler because it requires frequent fingering. (Tr. 1359.) Third, the ALJ asked the VE to assume that the hypothetical worker described in the first hypothetical was limited to sedentary exertion level work and frequent fingering. The VE testified that the hypothetical worker could perform two jobs in the electronic industry: printed circuit board

worker and semiconductor worker. (Tr. 1360.) The VE added the hypothetical worker could perform the job of "[s]tuffer" (i.e., stuffing material into objects) if the fingering was limited to occasional. (Tr. 1360.)

Plaintiff's counsel also posed a series of questions to the VE who testified at Plaintiff's hearing. Responding to Plaintiff's counsel's questions, the VE confirmed that the hypothetical worker could not sustain competitive employment if she missed two days or more per month and "it continued over time," she needed to take additional breaks that amounted to two days of work per month, or her reduction in pace/productivity amounted to two days of work per month. (Tr. 1360-62.)

In a written decision issued on October 17, 2016, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Plaintiff was not disabled. *See infra*. Plaintiff timely appealed.[5]

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.  LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."

*Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1)

---

[5] Plaintiff did not appeal the ALJ's decision to the Appeals Council (Pl.'s Opening Br. at 4), and the Commissioner has not raised any issue regarding an exhaustion requirement. *See generally Watkins v. Comm'r Soc. Sec.*, 457 F. App'x 868, 870 n.4 (11th Cir. 2012) ("Although it does not appear that Watkins appealed the ALJ's third decision to the Appeals Council, the Commissioner waived the exhaustion requirement by not raising it in the district court or in this Court.").

whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 12-30.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 1, 2002, the alleged disability onset date. (Tr. 15.) At step two, the ALJ determined that Plaintiff had the following severe impairments: "[M]orbid obesity; fibromyalgia; degenerative disc disease of the lumbar spine; carpal tunnel syndrome; depression; and an anxiety disorder[.]" (Tr. 16.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 16.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work that involves: (1) no more than "constant fine fingering," (2) avoiding heights and hazards, (3) never working around

"concentrated exposure to noxious fumes, odors, and pulmonary irritants," (4) performing "only simple, entry-level work," and (5) no more than "occasional interaction with the public and coworkers." (Tr. 18.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 28.) At step five, the ALJ found that Plaintiff is capable of performing jobs that exist in significant numbers in the national economy, including work as a bench assembler and light housekeeper. (Tr. 29.) Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.

## ANALYSIS

## I. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## II.    DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Plaintiff's subjective symptom testimony; and (2) failing to provide legally sufficient reasons for discounting the opinions of Plaintiff's examining physician, Dr. Krulewitch, and treating physicians, Drs. Rask and Kaye. (Pl.'s Opening Br. at 25, 32.) As explained below, the Court concludes that the ALJ's decision is based on harmful legal error and not supported by substantial evidence in the record. The Court also concludes that Plaintiff satisfies all three conditions of the credit-as-true rule and that a careful review of the record discloses no reason seriously to doubt that Plaintiff is disabled. Accordingly, the Court reverses the Commissioner's decision and remands to the agency for the calculation and award of benefits.

### A.    Plaintiff's Symptom Testimony

#### 1.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### 2.    Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or symptoms alleged. (*See* Tr. 19, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms"; Def.'s Br. at 4, acknowledging that there is no evidence of malingering). Accordingly, the ALJ was required to provide specific, clear, and convincing reasons for discrediting Plaintiff's subjective symptom testimony. (*See* Def.'s Br. at 4-5, arguing that the ALJ satisfied the clear and convincing reasons standard). The ALJ failed to meet that standard here.

### a.    Objective Medical Evidence

Plaintiff alleges disability due primarily to fibromyalgia. (*See* Tr. 19, noting that Plaintiff testified that her "main barrier to working was an inability to function reliably" in a work setting due to pain; Tr. 1189-91, noting that Plaintiff's exam was "consistent with fibromyalgia as [her] primary pain generator"; Tr. 1211, referring to fibromyalgia as Plaintiff's "primary disease"

based on an extensive review of the longitudinal record; Tr. 1354, indicating that Plaintiff testified that her ability to "function reliably" is the "main thing that's keeping [her] from being able to work," that her chronic pain can be "debilitating" and "affect[] [her] motor skills," and that her "mental issues" also "fluctuate around the pain a lot"). The ALJ discounted Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her fibromyalgia-related pain based on the fact that "[o]bjective findings have been highly inconsistent with [Plaintiff's] allegations of severe and chronic pain." (Tr. 24.) In support of this finding, the ALJ emphasized that Plaintiff's "neurologic examinations are grossly normal," that "[n]o provider has noted muscle atrophy or wasting," and that "[o]bjective studies of her spine have shown only very mild findings." (Tr. 24; *see also* Tr. 19-21, discussing medical records regarding fibromyalgia and noting that Plaintiff "had no muscle weakness" during a July 2006 exam, 2010 treatment notes showed that Plaintiff's "neurological examinations were grossly normal, with no weakness or other neurologic difficulties," Plaintiff exhibited "5/5 strength" on exam in 2010, 2011 records "again show [Plaintiff's] neurologic examinations were non-focal," Dr. Kaye "did not note any neurologic deficits, such as loss of strength or reflexes," but he did note that Plaintiff's "neurologic exam was essentially normal, with strength at the quads and hamstrings 4/5 on the right, and 5/5/ on the left," and 2012 records showed that Plaintiff's "neurologic examinations were non-focal"; Def.'s Br. at 5-6, citing the conflicting "objective medical evidence" as a clear and convincing reason for discounting Plaintiff's testimony, and emphasizing that "Plaintiff's neurological examinations were . . . normal" and a 2012 MRI of the lumbar spine showed "only mild findings of degenerative disease" and "mild disc bulging and mild changes").

The objective medical evidence is not a clear and convincing reason for discounting Plaintiff's testimony. The Ninth Circuit's opinion in *Revels v. Berryhill*, 874 F.3d 648 (9th Cir.

2017), illustrates this point. In *Revels*, as in this case, the medical records "largely pertain[ed]" to the claimant's "fibromyalgia, as d[id] the assessments concerning her limited functional ability." *Id.* at 656. Like here, the case "turn[ed] on whether the ALJ properly found [the claimant] not disabled based on his conclusions about her fibromyalgia-related limitations[.]" *Id.* As such, the Ninth Circuit found it "helpful to understand what fibromyalgia is, how it is properly diagnosed, and what its symptoms are." *Id.* The Ninth Circuit then provided the following background regarding fibromyalgia and how it should be evaluated in the context of a Social Security appeal:

> Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Typical symptoms include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue. What is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling. Indeed, there is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain. The condition is diagnosed entirely on the basis of the patients' reports of pain and other symptoms. There are no laboratory tests to confirm the diagnosis.

> For a long time, fibromyalgia was poorly understood within much of the medical community. Indeed, there used to be considerable skepticism that fibromyalgia was a real disease. In previous decisions, we were reluctant to recognize fibromyalgia as an impairment that could render one disabled for Social Security purposes.

> A sea-change occurred in 2012, when the SSA issued a ruling recognizing fibromyalgia as a valid basis for a finding of disability. The ruling provides two sets of criteria for diagnosing the condition, based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria. Pursuant to the first set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may fluctuate in intensity and may not always be present); (2) she has tenderness in at least eleven of eighteen specified points on her body; and (3)

there is evidence that other disorders are not accounting for the pain. Pursuant to the second set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may fluctuate in intensity and may not always be present); (2) she has experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems (fibro fog), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) there is evidence that other disorders are not accounting for the pain.

Therefore, diagnosis of fibromyalgia does not rely on X-rays or MRIs. Further, SSR 12-2P recognizes that the symptoms of fibromyalgia wax and wane, and that a person may have bad days and good days. In light of this, the ruling warns that after a claimant has established a diagnosis of fibromyalgia, an analysis of her RFC should consider a longitudinal record whenever possible.

*Revels*, 874 F.3d at 656-57 (citations, quotation marks, brackets, and footnote omitted). The Ninth Circuit added that, "[i]n evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods," and "[t]he failure to do so is error[.]" *Id.* at 662.

In many ways, this case parallels the decision in *Revels*. Indeed, in *Revels*, the ALJ determined that the claimant's "testimony was undercut by the lack of 'objective findings' supporting her claims of severe pain." *Revels*, 874 F.3d at 666. In doing so, the ALJ "highlighted several examinations that had mostly normal results, such as an X-ray and MRIs of [the] neck and back, as well as the nerve conduction and velocity study of her hands," and the ALJ "cited medical records showing that, at several doctor's appointments, [the claimant] exhibited normal muscle strength, tone, and stability, as well as a normal range of motion." *Id.* The Ninth Circuit held that the ALJ erred in discounting the claimant's testimony (as well as testimony provided by medical providers) because the ALJ failed to "consider" the claimant's "testimony in light of her

fibromyalgia diagnosis." *Id.* In support of this holding, the Ninth Circuit observed that the physical examination results cited by the ALJ were "perfectly consistent with debilitating fibromyalgia," that fibromyalgia "is diagnosed 'entirely on the basis of patients' reports of pain and other symptoms,' and 'there are no laboratory tests to confirm the diagnosis,'" and that "fibromyalgia is diagnosed, in part, by evidence showing that another condition does not account for a patient's [reported] symptoms." *Id.* (quoting *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)).

Similarly here, the ALJ failed to consider Plaintiff's testimony in light of her fibromyalgia diagnosis. On the contrary, in discounting Plaintiff's testimony, the ALJ cited examination results that are perfectly consistent with debilitating fibromyalgia. For example, the ALJ placed considerable emphasis on a number of neurological examinations that were normal and revealed normal strength. (*See* Tr. 24, stating "[o]bjective findings have been highly inconsistent with [Plaintiff's] allegations of severe and chronic pain," and noting that Plaintiff's "neurologic examinations are grossly normal," "[n]o provider has noted muscle atrophy or wasting," and "[o]bjective studies of her spine have shown "only very mild findings"; *see also* Tr. 19-21, noting that Plaintiff "had no muscle weakness" during a July 2006 exam, 2010 treatment notes showed that Plaintiff's "neurological examinations were grossly normal, with no weakness or other neurologic difficulties," Plaintiff exhibited "5/5 strength" on exam in 2010, 2011 records "again show [Plaintiff's] neurologic examinations were non-focal," Dr. Kaye "did not note any neurologic deficits, such as loss of strength or reflexes," but he did note that Plaintiff's "neurologic exam was essentially normal, with strength at the quads and hamstrings 4/5 on the right, and 5/5/ on the left," and 2012 records showed that Plaintiff's "neurologic examinations were non-focal"). These examination results do not undermine Plaintiff's

testimony regarding her fibromyalgia. *See Revels*, 874 F.3d at 666 (stating that fibromyalgia is "diagnosed 'entirely on the basis of patients' reports of pain and other symptoms,' and 'there are no laboratory tests to confirm the diagnosis'") (citation omitted); *Germany-Johnson v. Comm'r Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) (per curiam) ("Fibromyalgia . . . can be confirmed as a severe impairment without objective testing. In fact, persons suffering from fibromyalgia 'manifest normal muscle strength and neurological reactions and have a full range of motion.'") (citations omitted).

In sum, the Court concludes that the ALJ's findings reflect "an apparent fundamental misunderstanding of fibromyalgia," which "appears to be a recurrent problem" in Social Security appeals in this circuit.[6] *Revels*, 874 F.3d at 662. The ALJ's failure to consider Plaintiff's testimony in light of her fibromyalgia diagnosis and to construe the medical evidence in light of fibromyalgia's unique symptoms and diagnostic methods constitutes reversible error. *See id.* at 662-66 ("In evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods, as described in . . . *Benecke*. The failure to do so is error[.]. . . . Like his [improper] rejection of the opinions of [the treating physician] and physical therapist . . . , the ALJ did not consider Revels' testimony in light of her fibromyalgia diagnosis.").

### b.    Conservative Treatment

The ALJ also discounted Plaintiff's testimony on the ground that she received only conservative treatment. (*See* Tr. 24, noting that Plaintiff "received overwhelmingly conservative

_____

[6] It should also be noted that three different ALJs have now failed to provide legally sufficient reasons, supported by substantial evidence, for discounting Plaintiff's testimony. (*See* Tr. 12-13.)

treatment for her pain complaint," such as "opiate medication" and "steroid injections," and that Plaintiff received "treatment with a pain management specialist" and consulted with a doctor of physical medicine). In so doing, the ALJ erred.

"Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated." *Revels*, 874 F.3d at 667. In *Revels*, the claimant received epidural steroid injections in her neck and back and was prescribed opiate medication. *Id.* The Ninth Circuit held that the "ALJ provided no explanation why he deemed this treatment 'conservative' for fibromyalgia," and noted that they "have previously 'doubt[ed] that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment." *Id.* (quoting *Garrison*, 759 F.3d at 1015 n.20). Similarly here, the ALJ provided no explanation why steroid injections and opiate medications amount to conservative treatment of Plaintiff's fibromyalgia. (*See also* Tr. 86-87, noting that the judge who presided over the first appeal also rejected the assertion that Plaintiff's testimony was undermined by her conservative treatment history). Accordingly, as in *Revels*, the Court concludes that the ALJ committed harmful error.

The Commissioner counters that the ALJ appropriately emphasized Plaintiff's conservative treatment history, noting that Plaintiff did not receive injections and opiate medication until "well after her date last insured of December 2006" and that when Plaintiff engaged in this "more robust" treatment, her fibromyalgia-related pain was effectively controlled and thus not disabling. (Def.'s Br. at 8.) The Court is not persuaded by the Commissioner's argument. As an initial matter, the record does not support the Commissioner's assertion that Plaintiff's fibromyalgia was effectively controlled. (*See* Tr. 1354, testifying that Plaintiff's fibromyalgia pain waxes and wanes and "at times it's debilitating"); *cf. Benecke*, 379 F.3d at 590 (stating that "there is no cure" for fibromyalgia); *Revels*, 874 F.3d at 656-57 (explaining that

fibromyalgia is "diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms,'" and that "the symptoms of fibromyalgia 'wax and wane,' and that a person may have 'bad days and good days'") (citations omitted). Furthermore, the record suggests that Plaintiff's failure to engage in more "robust" fibromyalgia treatment before the date last insured was through no fault of her own. (*See* Tr. 1211-12, stating that Plaintiff "made every effort to obtain a diagnosis and treatment for her condition of chronic pain and fatigue with functional decline," opining that a "disease process masked [Plaintiff's] primary disease of fibromyalgia with its psychomotor symptoms of fatigue, pain, . . . [and] functional decline," and suggesting that "diagnosis failure" caused Plaintiff to take certain medications that "do not work with fibromyalgia"); *cf. Benecke*, 379 F.3d at 590 (explaining that fibromyalgia is "poorly-understood within much of the medical community").

For these reasons, the ALJ improperly discounted Plaintiff's testimony on the ground that she pursued only conservative treatment.

### c. Activities of Daily Living

The ALJ also discounted Plaintiff's testimony on the ground that her "robust activities of daily living . . . are highly inconsistent with her allegations in terms of her cognitive problems and 'unreliability.'" (Tr. 24; *see also* Tr. 1354, testifying that fibromyalgia impacts Plaintiff's ability "to function reliably"). In support of this finding, the ALJ noted that Plaintiff reported that "her favorite activities include[] reading, playing games, camping and trail hiking," and she gardens, digs in the dirt, took "care of her in-laws," used a dolly to help her friend move, and she homeschooled two of her children and, at times, was the primary caregiver.[7] (Tr. 24-25.) The

---

[7] Plaintiff's husband was unemployed at various points between the alleged onset date and the date of the ALJ's decision. (*See* Tr. 509, noting that Plaintiff's husband "was fired from his job in July 2010"; Tr. 1204, noting on December 21, 2015, that Plaintiff's "husband is currently unemployed"; *see also* Tr. 454, indicating that Plaintiff's husband completed a third-

ALJ also observed that Plaintiff "engages in significant activities advocating for her disabled son." (Tr. 25.)

The ALJ's reliance on Plaintiff's activities was misplaced. There is almost no information in the record about how often Plaintiff engages in her "favorite activities." The fact that Plaintiff might have engaged in reading, playing games, camping, or trail hiking between 2002 and 2016 is not inconsistent with her waxing and waning fibromyalgia-related pain. In addition, there is very little information in the record about how Plaintiff acted as a child advocate. The Commissioner notes only that Plaintiff reported that she had "'been recognized by State officials for her advocacy work for children in the child welfare system.'" (Def.'s Br. at 9, citing Tr. 705.) It appears that Plaintiff's "advocacy" revolved primarily around reuniting with her disabled son, addressing charges levied by the Department of Health and Human Services ("DHS"), which were later dropped, and performing work before the alleged onset date. (*See* Tr. 610, indicating that DHS "falsely" described Plaintiff as "'a drug addict'"; Tr. 627, noting that DHS accused Plaintiff's husband of abusing his disabled step-son; Tr. 607, indicating that Plaintiff was upset because she did not know where her disabled "son is, she only knows he is in a facility [in] Portland"; Tr. 612, noting that Plaintiff continued to have problems with DHS, "even though the charges against her and her husband have been dropped"; Tr. 827, reporting that Plaintiff has been an "'advocate' for all of her children and for herself," that her son "'almost died twice' in the care of state agencies and that she reported this to various state agencies and people," and that she "loosely described a 'legal battle advocating for [her] son'"; Tr. 1205, "From 1993 to 2001 [Plaintiff] often worked as an aid[e] full time in adult foster

party adult function report on July 18, 2007, and testified that he and his wife do "everything together").

homes."). These types of activities are not inconsistent with Plaintiff's claimed inability to perform full-time work.

Furthermore, the record reveals that Plaintiff injured herself when she attempted to help her friend move, that Plaintiff has injured herself when she attempts to garden, that there is almost no information in the record about how Plaintiff actually "cared" for her in-laws, and that Plaintiff's homeschooling of her children has been challenging, has involved assistance from Plaintiff's husband, and consists of "pretty much a determined program" where Plaintiff merely attempts to answer questions when necessary. (*See* Tr. 704, discussing "strategies for improving home schooling" because Plaintiff was concerned about her sons' "educational performance"; Tr. 705, noting that homeschooling is "challenging," but Plaintiff was "gr[ate]ful that her husband, who is highly organized, is helping out"; Tr. 1122, reporting only that Plaintiff was "taking care of her in-[l]aws and one may be living with them soon," and noting that fourteen out of eighteen fibromyalgia tender points were positive; Tr. 1137, noting that Plaintiff reported that she was stiff and felt "really sore," "tearing pain in the lower back" after "digging in the dirt yesterday"; Tr. 1242, indicating that Plaintiff "sustained a fall in her garden" and complained of pain; Tr. 1248, indicating that Plaintiff and her friend "were using a loading dolly to bring down a set of shelves from the truck" and "[a] shelf fell off the loading dolly and struck her in the right foot," and that Plaintiff was complaining about pain in her right foot; Tr. 1301, noting that Plaintiff "has a history of chronic incapacitating low back pain and exacerbated her pain last Friday when she twisted and fell while gardening"; Tr. 1356, testifying that the homeschooling is "pretty much a determined program" and Plaintiff will assist her children "if they have a problem"). These activities are not inconsistent with Plaintiff's inability to perform full-time

work, or waxing and waning fibromyalgia pain. Accordingly, the ALJ erred by discounting Plaintiff's testimony on this basis.

### d. Inconsistent Statements

The Commissioner also argues that the ALJ "properly found" that Plaintiff's testimony was undermined by her inconsistent statements. (Def.'s Br. at 10.) In support of her argument, the Commissioner identifies an inconsistency between Plaintiff and her husband's testimony regarding Plaintiff's difficulties with personal care. The ALJ does not appear to cite this inconsistency in his symptom analysis. (*See* Tr. 24-25.) It would be inappropriate, then, for this Court to consider that inconsistency here.[8] *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (stating that a reviewing court may not affirm an agency ruling for reasons not articulated by the agency). The ALJ did, however, note that Plaintiff testified that her husband "now was responsible for homeschooling her children," which the ALJ found inconsistent with Plaintiff's testimony that her husband also works "outside the home on a full time basis" and inconsistent with Plaintiff's "reports to her treating providers." (Tr. 25.) The record reflects that Plaintiff's husband's current work consists of performing "odds jobs and repairs," and that Plaintiff previously reported that she was grateful for her husband's assistance with homeschooling. (*See* Tr. 705, noting that homeschooling is "challenging," but Plaintiff was "gr[ate]ful that her husband, who is highly organized, is helping out"; Tr. 1352, testifying that Plaintiff's husband does "odd jobs and repairs"). Given this report and the nature of Plaintiff's husband's current job, Plaintiff's testimony and reports are not necessarily inconsistent with the fact that Plaintiff's husband plays (and has played) a significant role in his children's homeschooling program.

---

[8] In any event, the Court notes that the alleged inconsistency was the result of Plaintiff checking a different box than her husband with regard to whether she had difficulty with her "personal care" (Tr. 439, 455), but reasonable minds can ascribe different meanings to "personal care."

Accordingly, substantial evidence does not support discounting Plaintiff's testimony on this ground.

### e. Conclusion

For these reasons, the Court concludes that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's symptom testimony.

## B. Medical Opinion Evidence

### 1. Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with

boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### 2. Dr. Krulewitch

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for discounting the opinion of her examining physician, Dr. Krulewitch. (Pl.'s Opening Br. at 32.) Dr. Krulewitch's opinion conflicts with the assessments completed by the state agency medical consultants, none of whom opined that Plaintiff was disabled. Therefore, the ALJ needed to provide specific and legitimate reasons for discounting Dr. Krulewitch's opinion.[9] *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'") (citation omitted); *Killan v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Killian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ failed to do so.

The ALJ assigned Dr. Krulewitch's opinion "[l]ittle weight" and provided the following reasons for doing so: (1) Dr. Krulewitch's opinion is inconsistent with his exam, which showed that Plaintiff's "neurological exam was nonfocal, with no motor or sensory deficits," (2) Dr. Krulewitch's opinion regarding mental limitations is inconsistent with Plaintiff's "pleasant presentation on exam," (3) Dr. Krulewitch's opinion is inconsistent with Dr. Rung's exam, which showed that Plaintiff's "neurological exam was grossly normal," (4) Dr. Krulewitch's opinion is consistent with records showing that Plaintiff's "mental health symptoms were

---

[9] The same is true with respect to Dr. Rask's opinion, addressed below.

minimal and well-controlled with a low dose of antidepressant medications," (5)

Dr. Krulewitch's opinion is inconsistent with Dr. Daskivich's "opinion and exam findings," and

(6) Dr. Krulewitch "was hired . . . to perform the exam specifically in support of [the]

applications for benefits." (Tr. 25.)

The ALJ committed a number of errors in evaluating Dr. Krulewitch's opinion. First, the

ALJ erred because "[t]he purpose for which medical reports are obtained does not provide a

legitimate basis for rejecting them." *Lester*, 81 F.3d at 832.

Second, the ALJ erred in discounting Dr. Krulewitch's opinion based on the objective

medical evidence cited above. *Cf. Revels*, 874 F.3d at 663 (noting that the ALJ discounted a

treating doctor's opinion by pointing to several tests and exams that revealed normal results,

noting that fibromyalgia is "diagnosed 'entirely on the basis of patients' reports of pain and other

symptoms,'" stating that the ALJ's analysis "demonstrates a fundamental lack of knowledge

about fibromyalgia," and emphasizing that the treating physician appropriately looked "at

longitudinal records" in formulating his opinion) (citation omitted). Similarly here, Dr.

Krulewitch appears to have reviewed more medical records than any other provider, and it was

inappropriate to discount his opinion based on normal test and exam results. *See also Germany-*

*Johnson*, 313 F. App'x 771 at 778 ("Fibromyalgia . . . can be confirmed as a severe impairment

without objective testing. In fact, persons suffering from fibromyalgia 'manifest normal muscle

strength and neurological reactions and have a full range of motion.'") (citations omitted).

Third, the ALJ erred in relying on Plaintiff's "pleasant presentation" during an exam,

because that is not inconsistent with the symptoms of fibromyalgia. *See Revels*, 874 F.3d at 663

("[T]he symptoms of fibromyalgia 'wax and wane,' and a person may have 'bad days and good

days.'") (citation omitted). Furthermore, the record does not support the conclusion that

Plaintiff's mental impairments were well controlled on medication. (*See* Tr. 1211, noting that the longitudinal record revealed that there was "twelve years of failure to respond to moderate to high [levels] of SSRI for major depression"; Tr. 1354, indicating that Plaintiff testified that her "mental issues fluctuate around [her fibromyalgia-related] pain a lot").

For the foregoing reasons, the Court concludes that the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, for discounting Dr. Krulewitch's opinion evidence.

### 3.    Dr. Rask

The ALJ also failed to provide specific and legitimate reasons for discounting Dr. Rask's opinion, because he based that decision on the "same reasons" he assigned little weight to Dr. Krulewitch's opinion. (Tr. 27.) Although the ALJ also stated that Dr. Rask's checkbox form opinion was "brief and conclusory, and not supported by any explanation or analysis" (Tr. 27), the errors described above demonstrate that the rejection of Dr. Rask's opinion is not supported by substantial evidence.[10]

### C.    Remedy

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke*, 379 F.3d at 595 (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)) However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, the following "credit-as-true" criteria must be met before a court may remand for an award of

---

[10] In light of the errors described above, the Court does not address whether the ALJ also erred in discounting Dr. Kaye's opinion evidence.

benefits: (1) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion," (2) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," and (3) "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Id.* Even when these "credit-as-true" criteria are satisfied, courts retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.*

Plaintiff satisfies all three conditions of the credit-as-true rule. First, as explained above, the ALJ failed to provide legally sufficient reasons for rejecting, *inter alia*, Plaintiff's testimony and Dr. Krulewitch's opinion. Second, if this evidence is credited as true, the ALJ would be required to find Plaintiff disabled on remand because Plaintiff's testimony and the medical evidence supports the conclusion that she was disabled on or before her DLI. (*See* Tr. 14, noting that Plaintiff's DLI is December 31, 2006, and she remained insured through that date; Def.'s Br. at 13, noting that "Dr. Krulewitch opined that Plaintiff could not work since 2002"); *Truelsen,* 2016 WL 4494471, at *1 n.4 ("To be entitled to DIB, plaintiff must establish that [s]he was disabled . . . on or before [her DLI].") (citation omitted); *see also Revels,* 874 F.3d at 656-57 (explaining that fibromyalgia can be "diagnosed 'entirely on the basis of the patients' reports of pain and other symptoms'") (citations omitted).

The Commissioner argues that further proceedings are necessary in order to: (1) address Plaintiff's credibility (for a fourth time) based on "significant factual conflicts" between, *inter alia*, Plaintiff's testimony and the "objective medical evidence," and (2) reassess Dr. Krulewitch's opinion based on conflicts with the opinions of the state agency medical consultants (who did not examine Plaintiff or review nearly as many treatment records) and the

examining psychologist, Dr. Daskivich. (Def.'s Br. at 19-20.) The Commissioner also argues that further proceedings are necessary because the record as a whole creates serious doubt as to whether Plaintiff is disabled. (Def.'s Br. at 20.) The Court disagrees.

Plaintiff's fibromyalgia "has been repeatedly substantiated by tender-point examinations," which is "proper evidence of the condition." *Revels*, 874 F.3d at 669. Plaintiff's testimony and treatment records also show that she was suffering from severe waxing and waning fibromyalgia pain. *See id.* (reversing and remanding for the calculation and award of benefits, and noting that the claimant's "testimony, her function reports, and the treatment notes from her doctors consistently show that she was suffering from severe pain"). In addition, the Court sees no need for the ALJ again to address Plaintiff's testimony or Dr. Krulewitch's opinion, seeing as how this case turns on an impairment that (1) can be diagnosed entirely on Plaintiff's reports of pain and other symptoms, and (2) cannot be confirmed by tests or exams.

This Court does not have any serious doubt as to whether Plaintiff is disabled, and therefore reverses the Commissioner's decision and remands for an award of benefits.[11] *See also Rustamova v. Colvin*, 111 F. Supp. 3d 1156, 1165-66 (D. Or. 2015) ("Allowing the Commissioner a third opportunity to try to meet her burden at step five would create the very heads we win; tails, let's play again system of disability benefits adjudication, that the Ninth Circuit has repeatedly cautioned against." (internal quotation marks omitted) (citing *Benecke,* 379 F.3d at 595)).

///

---

[11] There is some indication in the record that Plaintiff's husband's current income might render Plaintiff ineligible for SSI benefits. (*See* Tr. 13, paragraph 4, Def.'s Br. at 3 n.2, Tr. 1369-70.) The Commissioner does not assert that further proceedings are necessary to address this issue. The Court presumes that this issue will be addressed when the agency calculates the award of benefits.

## CONCLUSION

For the reasons stated, the Court reverses the Commissioner's decision and remands to the agency for the calculation and award of benefits.

**IT IS SO ORDERED.**

DATED this 16th day of May, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge